PER CURIAM.
Co-defendants Kent Schepman and James Asbury (collectively, “Defendants”) appeal their convictions and sentences for principal to aggravated assault with a firearm, raising the same issue on appeal. They argue that the trial court committed fundamental error by giving a jury instruction that allowed the jury to find them guilty if they threatened one victim and caused fear in another. While the instruction was erroneous, the error was not fundamental because the threats and resulting fear related to both victims. Accordingly, we affirm because the error did not reach down into the validity of the trial to the extent that a guilty verdict could not have been obtained without the assistance of the alleged error.
Charging Document
Defendants were charged together by information as principals to aggravated assault with a firearm, as follows:
JAMES VICTOR ASBURY ... and KENT MICHAEL SCHEPMAN ... did unlawfully and intentionally threaten by word or act to do violence to the person of DANIEL ALDERSON or JEANEAN BIGOGNO or both, coupled with an apparent ability to carry out said threat, and utilized a deadly weapon, to wit: a firearm, without the intent to kill, and did an act or acts which created a well-founded fear in DANIEL ALDERSON or JEANEAN BIGOGNO or both that such violence was imminent and during the course of the commission of the offense KENT MICHAEL SCHEPMAN ... actually possessed and discharged a “firearm” ....
Relevant Trial Testimony
Defendants were tried together. Daniel Alderson testified that in 2012, he, his ex-wife, Jeanean Bigogno, their teenage daughter, and their three dogs moved into a home in Umatilla, Florida, located next door to Asbury. After they cleaned up the yard, they had a problem with feral cats coming into the yard and attacking their small dogs (two dachshunds and a pug). The cats also caused their yard and home to become infested with fleas. The cats seemed to be coming from Asbury’s yard. Alderson obtained a trap from Marion *1280 County Animal Services and began trapping the cats. After they trapped the first cat, Asbury looked at it and said that it was not his cat. He told Alderson to let him know if they continued to have problems. Alderson trapped about ten more cats over the next few weeks.
On October 16, 2012, Alderson called Animal Services and asked them to pick up another cat in the trap. He was painting his back porch when he heard voices and banging noises outside. He peeked out the window and saw Asbury hollering and banging on metal. Alderson could not make out all of the words, but he could discern that Asbury wanted his cat and was trying to get it. After Bigogno told Alderson what she had heard, Alderson called the sheriffs non-emergency phone number to alert the sheriffs department of the situation. He did not want anything to happen to the Animal Services employee when she came to pick up the trapped cat.
After Alderson hung up, he and Bigogno continued listening to Asbury, who became increasingly agitated, saying he wanted his cat. Then Asbury said he was going to get his gun and left on his scooter. A few minutes later, Alderson heard more voices coming from Asbury’s property. He heard someone say, “I’m going to get your dogs. I’m gonna get you. I’m gonna kill you. I’m gonna kill you all.” Asbury was screaming loudly. Then Alderson heard a single gunshot and called 911.
The State published the 911 call. Aider-son told the operator, “There’s a whole bunch of shots going off right now outside of our house.” Alderson and Bigogno could not see where the shots were going because they were inside their home listening.
OPERATOR: You heard approximately six shots from the neighbor’s house?
MR. ALDERSON: Yes, absolutely, and they were hooting and hollering about how they were going to get everybody and they’re going to go get a gun and they’re going to shoot everybody and they’re going to kill everybody and if they can’t get their cat, they’re going to kill everybody and hollering and stuff like that, so — and then the shots are already coming out, so I think we’re about to be dead so I think that someone should come here.
[[Image here]]
OPERATOR: Okay. Can you see where they’re at now?
MR. ALDERSON: I’m afraid to. I mean, we’re sitting in the living room and that’s about 30 feet away from the back door. We don’t go any closer.
[[Image here]]
OPERATOR: And you cannot see what they are doing?
MR. ALDERSON: Not at this point, no. And I’m not going to go and look either. But with the threats that they yelled, the kind of threat that they yelled and this has been going on, now, for about a good 20 minutes or so and then with the gunshots going off, I think that’s—
[[Image here]]
MR. ALDERSON: ... You have to excuse me. I’m a little bit rattled. I’ve never had this happen.
[[Image here]]
OPERATOR: And they were shooting as I was talking to you, correct?
MR. ALDERSON: Did you hear them, because yes—
OPERATOR: I heard something that went pow, pow, pow, like that.
MR. ALDERSON: That was it.
[[Image here]]
MR. ALDERSON: I hate to ask this question because I know you probably don’t know, but how long?
*1281 OPERATOR: Okay. They’re coming to you as fast as they can. I really don’t— can’t advise.
[[Image here]]
OPERATOR: Okay. Can you lock your doors?
MR. ALDERSON: I’m kind of afraid to go back there because it’s just — I know, so I don’t — I know the front door’s locked but the back door’s not.
[[Image here]]
MR. ALDERSON: He says he needs more gunpowder?
MS. BIGOGNO: Yes.
MR. ALDERSON: Well, my ex-wife just told me that she was listening by the kitchen and she heard him say he needs more gunpowder.
Police arrived and the call ended.
When he heard the first gunshot, Aider-son was scared for his life and his ex-wife’s life. When he heard the second gunshot, he jumped. “It was loud. And I was pretty sure at that point that something was going to happen to me or the house or to both.”
On cross-examination, Alderson stated that Asbury’s voice was the prevalent voice, the one he recognized making verbal threats. Neither defendant came into his home. Alderson never found any bullet holes or other indication that the gunshot hit his house, and he had no idea then or at trial where the shots were aimed.
The 911 dispatcher testified that she heard what sounded like gunshots while she was on the 911 call with Alderson.
Jeanean Bigogno testified that on that day of the incident, she was watching TV when she heard howling and yelling and banging outside through the open windows. She looked out the window and saw Asbury banging pots together and yelling “he wants his cat, give him his cat, it’s his cat.” Then Asbury began yelling at their three dogs, which were outside and barking because of the noise. He was yelling “shut up, shut up, I’m gonna kill you, get the hell out of here and just yelling at my animals.” At that point, Bigogno went outside to get her dogs. She made eye contact with Asbury and he was still yelling, “I’m gonna get them dogs, shut up, you know, just being irate and crazy.” She brought the dogs back inside and told Alderson that Asbury was acting irrationally. Alderson called the non-emergency police number.
Bigogno went to the back porch, which was closest to Asbury’s property to hear what was happening outside. She heard him say he was going to get a gun and “shoot us all. He’s gonna kill us.” At one point he said he was going to poison their dogs. He was going to get a gun and was going to shoot them. Then Asbury left on his scooter. About five minutes later, Bigogno heard Asbury’s scooter return and saw a blue truck behind him. Asbury began walking back and forth yelling that “he wants his cat, he’s gonna f* * *ing kill us and he’s gonna get a gun and he’s gonna shoot us and he’s never done nothing to us, there’s no reason for us to be doing this to him.” Bigogno pointed out on a map that Asbury was walking back and forth “from this area where the animal is to back here where our back door and back windows are” but it is not clear from the record whether Asbury was on Bigog-no’s property or his property at that point.
Then she saw Asbury and Schepman in Asbury’s yard where she originally saw him banging pots together. They could see her looking out the window if they looked. She believed they saw her because she was yelling to Alderson what they were saying. Bigogno heard a gun cocking and then heard a shot fired. The shot shook her house and her body. She ran from the back porch into the living room to call 911 but Alderson was already *1282 calling 911. Then she heard five or six more gunshots in rapid succession. She heard Asbury say, “I’m gonna kill them, I’m gonna kill you guys” and then it was quiet for a while. When asked how she felt at that point, she responded, “Oh, God, scared. I was shaking in my boots. I was very, very scared.” Bigogno was still in shock, crawling around on the kitchen floor, using the wall for cover, when she heard Asbury say, “We need to get more gun power.”
When police arrived, they observed As-bury and Schepman standing in Asbury’s back yard, about twenty feet from Alder-son’s home. Schepman was holding an assault rifle. The bullets fired from that rifle could pierce body armor or walls. The shots are very loud. Both Defendants made statements to police. Asbury said he was mad because the neighbor had his cat. He admitted threatening to kill the neighbor and the neighbor’s dog if his cat was not returned. He left briefly and returned with his friend, Schepman, “for what he called backup.” After returning, he continued to yell that he was going to kill the victim and the victim’s dogs. Schepman said he came to Asbury’s yard to shoot rats. Then he changed his story and said he had come to Asbury’s home with his assault rifle to scare the victim. He fired several rounds into the ground to scare the victim. Police did not determine where the shots were fired.
Motion for Judgment of Acquittal
In his motion for judgment of acquittal, Asbury argued that he did not have the ability to carry out any threat or make an assault with a deadly weapon. The trial court noted, however, that Defendants were charged as principals. Asbury also argued that the police testimony was not credible because Defendants’ statements were not recorded. The court denied As-bury’s motion as being “not remotely close.”
In his motion for judgment of acquittal, Schepman argued that “Alderson did not hear anything really” and Bigogno was eavesdropping. The statements were not directed at her. The court denied his motion as well.
Defense Case
Asbury testified that he never made any threats to the victims. He had not seen them. He also denied making any admissions to the police. Instead, he was merely repeating back to them what they had told him so he could be clear about what was being alleged. He brought Schepman to his home to help clean up his yard. He believed the noises heard on the 911 call were not gunshots, but him banging on a metal pan, which is how he notified the area cats to come and eat. Asbury did not ask Schepman to bring a gun and never saw him with a gun. He heard a shot and Schepman told him he was shooting at a rat. Asbury published a video taken from one of his surveillance cameras. It showed Asbury and Schepman standing in Asbury’s yard.
Jury Instruction, Sentence, and Appeal
During discussions about jury instructions, the trial judge gave the parties a copy of Garzón v. State, 980 So.2d 1038 (Fla.2008), and said that he had modified the instructions provided by the prosecutor to avoid the problem in that case. The problem in Garzón involved using “and/or” in between two defendants for the same charge. The judge noted that the supreme court had offered suggested alternatives, such as using “as to each defendant,” which he was incorporating into the instructions.
The judge gave the following jury instruction on aggravated assault, in pertinent part:
James Asbury and Kent Schepman, the defendants in this case, have been accused of the crime of principal to ag *1283 gravated assault with a firearm, possession and discharge.
As to each of the defendants, to prove the crime of aggravated assault, the State must prove the following four elements beyond a reasonable doubt. The first three elements define assault.
1. The defendant intentionally and unlawfully threatened, either by word or act, to do violence to Daniel Alderson or Jeanean Bigogno.
2. At the time, the defendant appeared to have the ability to carry out the threat.
3. The act of the defendant created in the mind of Daniel Alderson or Jeane-an Bigogno, a well-founded fear that violence was about to take place.
4. The assault was made with a deadly weapon.
The jury found both Defendants guilty of principal to aggravated assault with a firearm, “as charged in the Information,” with a special finding that Schepman discharged a firearm during the crime.
Schepman was sentenced immediately to the minimum mandatory term of twenty years in prison based on the special finding that he discharged a firearm during the commission of the aggravated assault. Asbury was later sentenced to three years in prison. Both timely appealed.
Standard of Review
Unpreserved arguments regarding jury instructions are generally not reviewable on appeal unless they constitute fundamental error. See State v. Delva, 575 So.2d 643, 644 (Fla.1991) (holding that unpreserved challenges to jury instructions “can be raised on appeal only if fundamental error occurred”). For an erroneous jury instruction to amount to fundamental error, it “must reach down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error.” Id. at 644-45 (quoting Brown v. State, 124 So.2d 481, 484 (Fla.1960)). In making such a determination, we must consider the “totality of the record at trial,” Garzón, 980 So.2d. at 1041, including “the other jury instructions, the attorneys’ arguments, and the evidence in the case.” Garzón v. State, 939 So.2d 278, 283 (Fla. 4th DCA 2006).
Jury Instruction Error
Defendants argue that the jury instruction in this case was fundamentally flawed because it allowed the jury to convict them by finding that they threatened one victim and caused fear in another. They cite two Fifth District cases in support of their argument.
In James v. State, 706 So.2d 64 (Fla. 5th DCA 1998), the amended information contained a single count charging the defendant with assaulting “either Katrina M. Barber or Tracey Hickson with a firearm.” Id. Hickson testified at trial that James did not threaten her. Instead, he aimed a gun at Barber, who was standing in the same group of girls with her. Hickson became afraid of stray bullets hitting her. Barber, however, apparently was “unaware of any threat posed by James.” Id.
On appeal, we held that the trial court committed reversible error in denying the defendant’s motion to dismiss the information because “separate and distinct offenses may not generally be alleged in a single count of an information.” Id. at 65 (citing McGahagin v. State, 17 Fla. 665, 668 (1880)). We also concluded that it was “fundamental error to instruct the jury in a way which would permit the jury to find that one alleged victim was threatened while the other had a well founded fear that violence was imminent.” Id. We explained:
Lumping alleged victims together in a single count of aggravated assault and permitting the jury to return a verdict of “guilty as charged” creates serious *1284 due process problems. As asserted by the defendant here, the jury, based upon the instructions given could have found the defendant guilty finding that the defendant threatened Barber and that Hickson (but not Barber) was frightened by the threat. However, such a scenario would not constitute the crime of aggravated assault. See § 784.011, Fla. Stat. (defining criminal assault as “an intentional, unlawful threat by word or act to do violence to the person of another, coupled with an apparent ability to do so, and doing some act which creates a well-founded fear in such other person that'such violence is imminent.”)

Id.

In Tindle v. State, 832 So.2d 966 (Fla. 5th DCA 2002), the defendant was charged with a single count of aggravated assault against “Charmaine Mixon ‘and/or’ Corey Williams.” Id. at 967. The trial evidence showed that while Mixon and Williams were moving furniture out of a home Mix-on and Tindle shared, Tindle threatened that he had a gun in his car, left, and returned with a gun. Mixon became fearful when she saw the gun. Williams testified that he did not fear for his own safety; he only feared for Mixon’s safety. Id. The jury instruction on the three elements of aggravated assault “included that Tindle’s acts created, in the mind of Mixon and/or Williams, a well-founded fear that violence was about to take place.” Id. Upon Tin-dle’s challenge to the jury instruction on appeal, we noted that “[although not cited by defense counsel, the State commendably (and consistent with its ethical obligation) has cited this court to the case of James v. State, 706 So.2d 64 (Fla. 5th DCA 1998) as being directly on point. We agree.” Id.
Subsequent cases have followed James and Tindle based on the principle that the lumping together of multiple victims in a single count with “or” or “and/or” may improperly allow the jury to find a defendant guilty by threatening one victim and causing fear of imminent violence in another victim. E.g., Fuller v. State, 942 So.2d 1039 (Fla. 2d DCA 2006); Miller v. State, 918 So.2d 415, 416-17 (Fla. 2d DCA 2006).[1]
In Miller, a bank security guard escorted Miller to her car after the bank fired her. 918 So.2d at 416. While getting into her car, Miller made an audible threat in the presence of the guard and another employee who was standing next to him. She then drove toward the two employees but stopped short of hitting them. Id. The other employee became frightened by Miller’s actions, but some evidence indicated that the guard was not frightened. Id. Miller contained jury instructions similar to the instant case in that both the first and third elements used the disjunctive “or,” allowing the State to prove the crime that the defendant threatened “Mr. Barnes or Ms. Zevetchin” and that the defendant’s threats caused, in the minds of “Mr. Barnes or Ms. Zevetchin, or either of them,” a well-founded fear that violence was about to take place. Id. at 416. The appellate court noted that although the jury instruction did not use the “and/or” conjunction contained in the information, its use of the coordinating conjunction “or” in both the first and third elements of the offense was “still fundamentally erroneous” because it permitted the jury to convict the defendant “if one alleged victim *1285 was threatened while the other had a well-founded fear of violence.” See also Comer v. State, 997 So.2d 440 (Fla. 1st DCA 2008) (reversing denial of ineffective assistance claim for failure to challenge use “and/or” to connect multiple victims in aggravated assault instruction).
Based on James, Tindle, Fuller, Miller, and Comer, we conclude that the trial court erred in instructing the jury that the State could prove the first and third elements of aggravated assault against Aider-son or Bigogno because it theoretically allowed the jury to find Defendants guilty by finding that they threatened one victim and placed the other in fear.
Fundamental Error Analysis
To determine whether the guilty verdicts could have been obtained without the assistance of the jury instruction error, the instruction must be “examined in the context of other jury instructions, the attorney’s arguments, and the evidence in the case.” Garzón, 989 So.2d at 288.
The evidence on the threat and fear elements distinguish this case from the evidence in James, Tindle, and Miller.[2] In James, the defendant threatened one victim and frightened another. In Tindle and Miller, the defendants threatened both victims but only frightened one of them. In the instant case, however, Defendants’ threats were directed at both victims and caused fear in both victims. Specifically, both Alderson and Bigogno testified that Asbury, while standing within hearing distance, loudly and repeatedly threatened to “kill you all,” “get everybody,” “kill everybody,” “kill us,” “shoot us,” and “kill you guys.” Likewise on the fear element, both Alderson and Bigogno testified that when the shots started, they both ran to call 911. Alderson was scared for his life. He told the 911 operator that he and Bigogno were in the living room, afraid to look outside and see what was happening or even lock the back door. When asked how she felt at that point, Bigogno stated, “Oh, God, scared. I was shaking in my boots. I was very, very scared.” Bigogno was in shock, crawling around on the kitchen floor, and using the wall for cover.
Defendants’ attempted factual assertions to the contrary in their briefs are, to use the words of the trial judge, “not remotely close.” They assert, among other things, that: (i) Alderson was afraid but did not believe violence was imminent; (ii) Aider-son was chiefly concerned about what might happen to the Animal Services agent when she came to collect Asbury’s cat; (iii) neither victim behaved like a person who feared imminent harm; and (iv) neither Defendant gave any indication that violence was imminent. These assertions grossly distort the victims’ testimony.
The factual distinction between the instant case and those finding fundamental error is critical. In those other cases, there was a real possibility that the jury could find the defendant guilty by concluding that he threatened one victim and caused fear in another. In this case, the evidence precludes that scenario from being a realistic possibility. Because the overwhelming evidence demonstrates that the defendants threatened and caused fear in both Alderson and Bigogno, the jury must have concluded that Defendants assaulted both victims, not one or the other. See Groom v. State, 36 So.3d 707, 710 (Fla. 1st DCA 2010) (holding that connecting three victims in single aggravated assault instruction not fundamental error under totality of circumstance because of overwhelming evidence that defendant assaulted all three victims with firearm). Moreover, nothing in the attorneys’ arguments or the remaining jury instructions suggested that the jury could determine guilt by *1286 finding that Defendants threatened one victim and caused fear in another. Unlike the other cited cases, it simply cannot be said in this case that a guilty verdict “could not have been obtained without the assistance of the alleged error.” Delva, 575 So.2d at 644-45; cf. Bryant v. State, 30 So.3d 591, 595 (Fla. 2d DCA 2010) (finding use of “and/or” in robbery instruction not fundamental error where defendant’s demand for victim’s purse by pointing a gun to her son’s head was sufficient to support robbery charge because it induced fear in a reasonable person).
As many other cases have noted, Florida courts have long condemned the use of the conjunctions “and/or” and “or” to connect multiple defendants or multiple victims within a single criminal charge. See, e.g., Miller, 918 So.2d at 416 n. 1. We urge prosecutors and trial judges to avoid such faulty shortcuts. We believe the solution to the problem that occurred in this case lies more in modifying the charging document than the jury instruction. As we noted in James, it is improper to include multiple victims in a single count alleging aggravated assault because doing so results in charging multiple offenses within a single count. James, 706 So.2d at 65. Therefore, one solution to these related problems is to charge separate counts for each victim and to give separate instructions for each count. While this solution may result in longer jury instructions, it avoids the much greater consequences of a retrial or a defendant being discharged because of this avoidable error.
Remaining Arguments
Defendants also attempt to suggest that no aggravated assault was committed because: (i) they did not shoot into the victims’ home, unlike the defendant in Kin-dell v. State, 413 So.2d 1283 (Fla. 3d DCA 1982), disapproved on other grounds, Reynolds v. State, 452 So.2d 1018 (Fla. 3d DCA 1984); (ii) they did not enter the victim’s home, citing L.C. v. State, 799 So.2d 330 (Fla. 5th DCA 2001); and (iii) the shots ended long before police arrived, suggesting that any threat was conditional.
In L.C., the defendant, who was standing outside, told the victim, who was inside a locked apartment, to “come out the door. I’m going to beat your ass.” 799 So.2d at 331. This court reversed the defendant’s adjudication of delinquency because the threat was conditional, the defendant had no apparent ability to carry out the threat, and the defendant never attempted to enter the victim’s apartment. Id. at 332.
In Kindell, the appellate court rejected the defendant’s argument that there was no evidence that the victims feared imminent harm. 413 So.2d at 1286. The evidence showed that the defendant became enraged, threatening to leave the apartment and return with a gun. Id. at 1287. She left and returned stating she was going to start shooting if no one opened the door. “Shots then penetrated the door striking both victims.” Id. The appellate court stated that the victims did not need to see the firearm to be placed in fear. Rather, the defendant’s threats to deal with victims upon her return, and upon return, to start shooting if the door was not opened, were sufficient to warrant a reasonable fear of imminent harm. Id. Similarly, in the instant case, Defendants’ repeated threats to go get a gun and shoot the victims, leaving and returning with a gun, repeating the death threats, and then shooting multiple loud shots nearby, were sufficient acts to cause fear of imminent bodily harm in the mind of a reasonable person.
Finally, Schepman challenges the prosecutor’s closing argument despite conceding that any errors were not preserved and not likely to be viewed as fundamental error. This insufficient and conclusory argument, unsupported by a separate issue on appeal and any supporting facts or legal *1287 authority, fails to warrant independent consideration.
AFFIRMED.
ORFINGER, LAWSON, JJ., and HARRIS, C.M., Senior Judge, concur.

. We note with incredulity that the State was able to brief this case without even referencing James or Tindle, or any of the subsequent cases following them. Rather than concede error, as in Tindle, or attempt to distinguish the cases that Defendants relied upon as controlling, the State simply ignored them. This briefing technique, if one can call it that, is wholly unhelpful and unprofessional. We expect more from the lawyers practicing before the court.

. Fuller and Comer did not recount the evidence in those cases.